**GULF, C. & S. F. RY. CO. v. MARS et al.**
(No. 12077.)

Court of Civil Appeals of Texas. Fort Worth.
Feb. 9, 1929.

Rehearing Denied March 9, 1929.

Lee, Lomax & Wren, of Fort Worth, for appellant.

Templeton & Templeton, of Fort Worth, for appellees.

BUCK, J. This is a suit by W. W. Mars, Bert Mars, I. K. Howell, and A. F. Hoffsteffer, against the Gulf, Colorado & Santa Fé Railway Company, for cattle claimed to be injured, and some killed, in six shipments from White's Ranch, a station on the line of railway between the station of Boliver and the city of Beaumont. Mars and his associates bought some 400 head of steers from White, and delivered them to the railroad company for shipment. The first shipment was of date May 4, 1925, and the last shipment was on June 16, 1925.

The cause of action was tried in the Forty-Eighth judicial district court of Tarrant county, and the answers of the jury were favorable to the defendants on the second, third, fourth, and fifth shipments, but favorable to the plaintiff' on the first and sixth

shipments. The bill of lading showed that the shipment of May 4th was of six cars, containing 164 head of steers, consigned to the Cassidy Southwestern Commission Company, designation Oklahoma City, and, eight cars, containing 216 steers, consigned to the Cassidy Southwestern Commission Company, designation St. Louis, Mo., and six cars, containing 162 steers, consigned to the same commission company, designation Fort Worth.

Since the plaintiffs did not perfect their appeal on the assignments directed to the judgment in the other four shipments, we need only concern ourselves about the first and sixth shipments. From a judgment in favor of plaintiffs and against the defendant for $1,444.40, together with 6 per cent. interest thereon from June 20, 1925, to January 14, 1928, aggregating $1,636.76, said amount being based on the verdict of the jury to issues submitted to them in reference to shipments 1 and 6, the defendant has appealed.

### Opinion.

Appellant's contention is that the ten cars contained in the shipment to St. Louis, from Fort Worth, were originally consigned to Cassidy Southwestern Commission Company, at Fort Worth, and that upon delivery of said cattle to said commission company at Fort Worth, the appellant had completed its contract, and was not liable for any damage done to said cattle while en route from Fort Worth to National Stockyards, Illinois.

Charles Caster, a witness for plaintiffs, testified that he worked for the appellant; that with reference to the shipment of ten cars of cattle that came over the Santa Fé from White's Ranch on May 5, 1925, and were unloaded at Fort Worth, and were subsequently reconsigned over the M., K. & T. Ry. Company to National Stockyards, six of the cars so reconsigned were of the shipment originally shipped from White's Ranch to the Cassidy Southwestern Commission Company, destination Fort Worth. These cars were numbers as follows: 54791; 56932; 58573; 58914; 55710; 58961. The other four cars, making up the ten reconsigned over the M., K. & T. Ry. Company to St. Louis, or National Stockyards, were 56095; 56326; 56690; 58118. That the cars were originally routed as shown by the bill of lading from White's Ranch, destination Oklahoma City, but Caster testified that when they reached Fort Worth the destination shown was Fort Worth. They were probably rerouted in passage from Oklahoma City to Fort Worth.

The Federal Statutes, 8604a, provides: "Any common carrier, railroad, or transportation company subject to the provisions of this act receiving property for transportation from a point in one State or Territory or the District of Columbia to a point in another State, Territory, District of Columbia, or from any point in the United States to a point in an adjacent foreign country shall issue a receipt or bill of lading therefor, and shall be liable to the lawful holder thereof for any loss, damage, or injury to such property caused by it or by any common carrier," etc. United States Compiled Statutes, 1916, Ann. vol. 8, p. 9289 (49 USCA § 20(11).

It is apparently by this act that the plaintiffs claim that they had the right to reconsign the shipment from Fort Worth to St. Louis or National Stockyards and get the advantage of the reduced rates.

It will be noted that if the contention of appellant is sustainable, i. e., its duty ended and its obligations were completed upon the delivery at Fort Worth to the Cassidy Southwestern Commission Company of the shipment of six cars, then this act does not apply to a reconsignment over another railway company to a point in another state.

In Bracht v. S. A. & A. P. Ry. Co., 200 Mo. App. 655, 209 S. W. 579, by the Kansas City Court of Appeals, of Missouri, it is held that where shipments were billed from a point in the state to another point in the same state, and were not intended for another state, but after the car arrived at destination the shipper entered into a new agreement with another company to ship to another state, this would not relate back to the origin of original shipment and change its character so as to hold the initial carrier liable for damages while in the possession of the reconsignment carrier.

In this case the court said:

"It is conceded that whether a shipment is interstate or intrastate is not controlled by the mere fact of it being billed as one or the other," citing cases.

Again:

"But to make a shipment interstate, it must be a shipment intended for another state; and if so intended it will not be deprived of its interstate character by being billed to an intermediate point, in the state of its origin. The initial shipment must be the beginning of an interstate journey. * * * A different rule would make us say that, though a shipment is billed intrastate, and is intended as intrastate, it will nevertheless become interstate, if from some subsequent consideration it is shipped into another state. * * *

"The vegetables in this controversy were actually shipped and billed from Ingleside to Dallas, Texas. That they were not intended to be shipped into any other state conclusively appears. After the car arrived at destination the shipper changed his mind, entered into a new engagement with the M., K. & T. Ry. Co., whereby he shipped the car to Kansas City, Mo. Under no consideration could this be held to relate back to the origin of the original shipment and change its character. Gulf, Colorado & Santa Fé Ry. Co. v. Texas, 204 U. S. 403, 27 S. Ct. 360, 51 L.

Ed. 540; *Illinois Grain to Chicago*, 40 I. C. C. 124."

This case was affirmed by the Supreme Court of the United States in an opinion published in the United States Supreme Court Reports, Bracht v. San Antonio & A. P. Ry. Co., 254 U. S. 489, 41 S. Ct. 150, 65 L. Ed. 366, in which the court said, quoting from the headnote: "The liability of the initial carrier of goods consigned by a shipper to himself at a point within the state, where he intended to sell them, and shipped under an intrastate bill of lading that contained no reference to diversion or reshipment, is governed solely by such bill of lading, subject to any applicable rules and regulations prescribed by state authority, although, upon arrival at destination, at a point beyond such initial carrier's own line, the carrier then having possession of the goods forwarded them, upon the shipper's request, made after arrival, to a point in another state, taking up the original bill of lading, and issuing an interstate one, and such initial carrier may not be held liable by virtue of the Carmack Amendment of June 29, 1906, to the Interstate Commerce Act of February 4, 1887, for damages sustained in the course of transportation beyond the destination originally specified."

There is *no recitation or notation* in the bill of lading of the six cars billed from White's Ranch to Fort Worth indicating any purpose of the shipper to have these cars reconsigned at Fort Worth, after reaching that point, and after testing out the market. Nor is there any evidence that the shipper had any such purpose of election in his mind at the time of shipment. The cattle are billed as "ordinary live stock," "for immediate slaughter." I. K. Howell, one of the persons who bought the cattle for shipment and the only one of the owners who was present at White's Ranch at the time of loading, testified: "There were twenty-four or twenty-five cars of cattle in the first shipment, and they were consigned to the Cassidy Southwestern Commission Company; the cattle were intended for four different markets, Fort Worth, Oklahoma City, Kansas City, and St. Louis. The ten cars that ultimately went to National Stockyards (otherwise designated as the St. Louis shipment), Illinois, was out of this shipment of twenty-four or five cars, but I don't know which ten cars went there; *they were loaded at the same time*. * * * The agent was there and I am sure that he gave me a shipping contract for each of the shipments, but I did not keep them. * * * The contract now shown me, dated May 4, 1925, at White's Ranch covering shipment by K. C. White to Cassidy Southwestern Commission Company, covering 162 head of steers in six cars, is one of the contracts covering the shipment. * * * The contract now shown me, dated May 4, 1925, at White's Ranch, in the name of G. C. Mays, to Cassidy Southwestern Commission Company, via G. C. & S. F. Ry. Co., covering six cars of cattle, is another one of the contracts covering this shipment. The contract covers six cars loaded on May 4th, and that is my signature. I signed Mr. May's name to it. I recognize it because I have signed others for him. * * * The contract now shown me, dated May 4th, from White's Ranch, in the name of K. C. White, covering 108 steers in four cars, shipped to Cassidy Southwestern Commission Company, at Oklahoma City, covered a part of the cattle of the shipment of May 4th. As I remember, there were 24 cars loaded in the shipment of May 4th. I know that some of the cattle in the shipment of May 4th were sold at Fort Worth."

Continuing cross-examination, the following question was asked:

Q. "In your petition in this case, you are suing on two hundred and sixty-eight head leaving White's Ranch May 4th, which subsequently got to National Stockyards, and one hundred and sixty-three in six cars, moving to Kansas City. Those are the only two shipments involved in this case leaving there on May 4th? A. Yes, there was no claim for the cattle, I suppose, that came to Fort Worth, or that went to Oklahoma City. With reference to the two hundred and sixty-eight head of cattle, in eight cars, consigned at White's Ranch to St. Louis, moving via the Santa Fé, I cannot say whether those cattle actually went to St. Louis or not; I billed the cattle and I was there and gathered the cattle and shipped them out, but I did not pay any attention to the handling of the cattle after they left the ranch. Mr. Mars was here at Fort Worth and he was looking after diverting the cattle and consigning them and I did not keep up with that As to whether I advised the agent as to the destinations other than those shown in the contracts here, you know that has been three years ago and I can't remember all those things. I know that if I had cattle going to St. Louis that I wanted to stop at Fort Worth and try them out here on the market, that I had the privilege of originally billing them to St. Louis with the privilege of the Fort Worth market. You could do that. As to whether any of the shipment of May 4th was billed that way, I will say that I knew the cattle were billed that way and I knew that Mr. Mars was here in Fort Worth and that he was going to divert them. In telling the agent what to put on the contracts, I think I would have told him where the stuff was going, if the contracts show some of them going to Fort Worth and some to Oklahoma City, some to Kansas City and some to St. Louis, but I don't remember about all those things. Of course I did not communicate to the agent that it was the intention to ship the Oklahoma City cattle to St. Louis; I did not tell the agent that. I did not tell the

agent that it was the intention to reconsign to St. Louis the six cars billed to Fort Worth. I did not tell the agent anything like that. I should think that, as far as the agent knew, he would think the cattle were going to the destinations shown in the contracts."

■ Since the evidence tends to show, if it does not show, that the shipment of six cars of cattle from White's Ranch, destination Fort Worth, was a complete transaction, and that upon the delivery of said cars at Fort Worth to the Cassidy Southwestern Commission Company the obligations of the carrier arising out of the contract were at an end, we do not think that a reconsignment of the cattle after they reached Forth Worth, to National Stockyards, would tend to revive or continue the obligations and duties of the original carrier, G. C. & S. F. Ry. Co.

■ While we are inclined to think, but do not here decide, that the other four cars originally destined for Oklahoma City, and probably reconsigned in transit, first to Fort Worth and then to National Stockyards, East St. Louis, Ill., might come within the provisions of the federal statutes, above quoted, and that the original carrier would be liable for any negligence, causing injury to or loss of any of the cattle while en route from Fort Worth to National Stockyards, yet, since there is no means of telling how many of the cattle so injured, crippled, or depreciated were in the six cars and how many were in the four cars, it will be necessary for us to reverse the judgment and remand the cause as to the entire shipment from Fort Worth to National Stockyards. An amendment to the Interstate Commerce Act, of date of July 3, 1926 (49 USCA § 20 (11), provided: "That the liability imposed by this paragraph shall also apply in the case of property reconsigned or diverted in accordance with the applicable tariffs filed as in this Act provided."

■ It cannot be made applicable to this shipment, as this shipment was made prior to the passage of the amendment. See Clark v. L. & N. Ry. Co., 216 Ala. 637, 114 So. 295; Parker-Bell Lumber Co. v. Great Northern Ry. Co., 69 Wash. 123, 124 P. 389, 41 L. R. A. (N. S.) 1064; Barrett v. Northern Pac. Ry. Co., 29 Idaho, 139, 157 P. 1016.

Nor do we think that we can determine by the record what portion of the damages assessed by the jury should be directed to the shipment already discussed and what portion should be directed to the shipment of date June 16, 1925, for which judgment was rendered for damages for the plaintiff. The court submitted the cause upon special issues submitted, covering the entire six shipments, and in the judgment the damages found were given as $1,444.40, together with interest from June 20, 1925, to January 24, 1928, amounting to $222.36. In other words, the judgment does not show the amount of damages found by the jury on the last shipment made, but is given as a whole, including the first shipment and the last shipment.

■ Therefore we conclude that the judgment as a whole should be reversed and remanded; and it is so ordered. The judgment for the defendant as to the shipments 2, 3, 4, and 5, no appeal having been perfected as to this part of the judgment, is left undisturbed.

## On Appellees' Motion for Rehearing and to Certify.

We do not think the case of Gulf, Colorado & Santa Fé v. Texas Packing Co., 244 U. S. 31, 38, 37 S. Ct. 487, 61 L. Ed. 970, especially relied on by appellees in their motion for rehearing, enunciates any legal principle contrary to our holding. In the cited case it appeared that the original shipment was interstate, from Temple, Tex., to St. Louis, Mo. After the shipment of dressed poultry had left Temple, a representative of the packing company advised the agent of the railway company that the poultry had been sold to a buyer in Chicago, and requested the railway company to so notify its agent at St. Louis, and to have the shipment reconsigned to Chicago. This was done, and the shipment was reconsigned over the Wabash Railroad Company to Chicago. When the shipment reached Chicago it was discovered that the shipment had been injured in transit, and the poultry was deteriorated in value, and it was sold in its deteriorated condition for the best price obtainable. The Wabash Railroad Company was made a party defendant, and the Santa Fé Railroad Company asked for a judgment over against it for any damage to the shipment occurring to said shipment on its line of railway. The bills of lading issued by the initial carrier required that the car should be iced, and re-iced at "all regular icing stations" en route. The evidence shows that the cars were in fact re-iced en route to St. Louis at all but one regular station, to wit, at Shawnee, Okl.; but the failure to re-ice at this point resulted in a lapse of from 28 to 50 hours without ice and salt. Upon the issues made, the jury found for the packing company against the Santa Fé Railroad Company, and upon the issue between the Santa Fé Railroad Company and Wabash Railroad Company, the verdict was in favor of the Wabash Railroad Company. In other words, the jury found that there was no negligence on the part of the Wabash Railroad Company. Hence any negligence contributing to the injury of the shipment must have been while the shipment was on the line of the Gulf, Colorado & Santa Fé Railway Company, and in favor of the Wabash Railway Company as to the claim of the Santa Fé Railroad Company for judgment against it for any amount of damages which the facts showed occurred on the Wabash Railroad Company.

We do not find any other cases in conflict with our former holding, nor do we think that the case is one calling for a certification to the Supreme Court; and motions for rehearing and to certify are overruled.